IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 1, 2024

## IN RE NASH M.

**Appeal from the Chancery Court for Knox County**
**No. 198513-2          Richard B. Armstrong, Jr., Chancellor**

———————————————

### No. E2023-01318-COA-R3-PT

———————————————

The Chancery Court for Knox County ("the Trial Court") terminated the parental rights of Kelsie M. ("Mother") to Nash M. ("the Child"), finding by clear and convincing evidence the statutory ground of severe child abuse and that termination was in the Child's best interest. Mother appealed, and this Court vacated the judgment due to an insufficient record and remanded for preparation of the transcripts of the proceedings. On remand, the Trial Court entered orders providing for the payment of the transcripts and reinstated its judgment terminating Mother's parental rights. Mother appealed again, and transcripts of the proceedings have been presented in the record. Based upon our thorough review, we discern no reversible error and affirm the Trial Court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and J. STEVEN STAFFORD, P.J., W.S., joined.

Andrew J. Crawford, Knoxville, Tennessee, for the appellant, Kelsie M.

Meghan A. Bodie, Knoxville, Tennessee, for the appellees, Michael H. and Chelsea H.

## OPINION

### Background

The Tennessee Department of Children's Services ("DCS") removed the Child from Mother's custody in December 2018, after her boyfriend, Arshad R., was arrested for possession of methamphetamine with the Child present in his car. Once DCS was able to contact Mother, Mother submitted to a urine drug screen and tested positive for

methamphetamine. The Child likewise tested positive for a "very high level of methamphetamine." As a result, the Juvenile Court for Knox County ("the Juvenile Court") entered an order adjudicating the Child as severely abused in an order entered *nunc pro tunc* February 28, 2019.

The Child was removed from DCS custody and placed in the custody of Joshua and Michele E. ("Co-Petitioners") in January 2019. Michael and Chelsea H. ("Petitioners") obtained physical custody of the Child in May 2019. On July 31, 2019, Petitioners filed a petition in the Trial Court, seeking the adoption of the Child and termination of parental rights of Mother and Dontae T. ("Father").[1] Co-Petitioners co-signed the petition and consented to the adoption of the Child by Petitioners. Petitioners alleged several grounds of termination against Mother, including abandonment by failure to visit, abandonment by failure to support, severe child abuse, persistence of conditions, and failure to manifest an ability and willingness to assume custody of the Child. Petitioners also alleged that termination of Mother's parental rights was in the Child's best interest. The Trial Court appointed a guardian *ad litem* ("GAL") for the Child and an attorney for Mother.

Trial was scheduled for July 7, 2021, but Mother filed a motion for a continuance the day before, asking for more time to secure two witnesses. The Trial Court granted the motion in part and proceeded with trial to address solely the grounds for termination. Trial with respect to the best interest determination was postponed. Petitioners proceeded on only one ground: severe child abuse pursuant to Tenn. Code Ann. § 36-1-113(g)(4). The Trial Court found that Petitioners proved that ground by clear and convincing evidence based upon the Juvenile Court's 2019 order adjudicating the Child severely abused by Mother.

The trial to adjudicate whether termination of Mother's parental rights was in the Child's best interest was held over three days in August 2021. Mother; Mother's probation officer, Joshua Langbein; Mother's case worker from Frontier Health, Hannah Gilliam; and one of the Child's custodians, Petitioner Chelsea H. testified. Mother testified that she delivered the Child while she was in a drug rehabilitation facility called Great Starts. Mother graduated from the program when the Child was four months old. Mother became connected with Co-Petitioners through a program called Safe Families. According to Mother, Co-Petitioners would babysit the Child while Mother worked. When Co-Petitioners were out-of-town, Petitioners would babysit the Child.

Mother lost custody of the Child on December 5, 2018, when the Child was approximately one year and nine months old. In December 2018, Mother's then-boyfriend, Arshad R., was arrested for methamphetamine possession with the Child in his car. Following the Child's removal into DCS custody, both the Child and Mother tested

---

[1] Father is not a party in this appeal, and accordingly, we restrict our focus to Mother.

positive for methamphetamine. During trial, Mother questioned the credibility of the results of these drug screens.

Mother was then arrested on May 1, 2019, and pled guilty to a charge of intent to deliver methamphetamine, a Schedule II drug. She was incarcerated from May 1, 2019 until March 19, 2020, and sentenced to six years on supervised probation. Mother testified that the last time she used methamphetamine was while she was in jail in March 2020. Mother never re-entered a rehabilitation program.

The testimony at trial showed that the Trial Court had tried on at least three prior occasions to obtain a drug screen from Mother but was never able to obtain these drug screens due to an array of excuses offered by Mother. At the end of the second day of trial, on August 13, 2021, the Trial Court ordered Mother to submit to a hair follicle test that day. On the final day of trial, the hair follicle results were submitted as evidence and revealed that Mother had tested positive for methamphetamine, despite her insistence that there was no reason for her to submit to a drug screen and that she had not used methamphetamine in over a year. When questioned about the results of the test, Mother insisted that the test was a false positive and insinuated that Petitioners somehow bribed the testing lab to fabricate the results.

Mr. Langbein testified positively on Mother's behalf, stating that she was "doing really well" on probation. However, he explained that Mother had been drug screened only twice while under his supervision, once in February 2021 and once a week before trial. He also was unaware that her live-in boyfriend[2] was a convicted felon, which is a violation of her probation. He testified before Mother's positive test results for methamphetamine were obtained and submitted as evidence.

Ms. Gilliam likewise testified positively for Mother. Ms. Gilliam explained that she was not a therapist but rather worked with clients on improving their "external" circumstances, such as housing and employment. She testified that Mother had been her client since June 2020 and that Mother had gone "above and beyond with what she was supposed to do to make sure that she has a stable environment to get her son back." Ms. Gilliam testified that she had no concerns about Mother's sobriety and that Mother neither attended "meetings" nor needed to attend meetings because Mother had informed her that she does not get "cravings." Ms. Gilliam's testimony also was presented before Mother's positive hair follicle test was obtained and submitted as proof.

The Trial Court entered judgment finding that termination of Mother's parental rights was in the Child's best interest and terminating Mother's parental rights on September 13, 2021. The Trial Court made the following findings of fact:

---

[2] Mother's boyfriend at the time of trial was not Arshad R.

The Court finds the Respondent/Mother to have been evasive in her testimony, and therefore lacked credibility.

The Court considered the best interest factors in T.C.A. §36-1-113, and finds they weigh in favor of termination of Respondent/Mother's parental rights. The Court finds the Respondent/Mother has not made an adjustment of circumstances as to make it safe to place the child in the home of the Respondent/Mother. The Court finds that the Respondent/Mother has a history of substance abuse issues, specifically, with methamphetamine having tested positive at the time the child was removed from her care in 2018. The Respondent/Mother admitted to using methamphetamine in March, 2020. The Respondent/Mother again[] tested positive for methamphetamine on August 13, 2021. Further, the Respondent/Mother pled guilty to a methamphetamine charge in 2021. When the minor child was removed from the Respondent/Mother's care, the Department of Children's Services developed a Permanency Plan giving the Respondent/Mother the opportunity to regain custody of the minor child, however, the Respondent/Mother did not avail herself of this service and instead got arrested and spent a year in jail.

The Court finds that although the Respondent/Mother had the opportunity to exercise visitation 59 times, she only exercised visitation on 24 occasions. The Court previously informed Respondent/Mother that if she completed a hair follicle drug screen and the results were favorable, the Court would consider exp[a]nding her visitation, however, she never did so. Because of her lack of consistent visitation, the Court finds the Respondent/Mother has not developed a meaningful relationship with the minor child. While the Court cannot say there is no relationship between the Respondent/Mother and the minor child, the Court finds the relationship is not a meaningful one.

The Court does not find the minor child has any emotional or psychological issues that would be affected by a change in caretakers, however, the Court does find it would be stressful on the minor child to move the minor child from the current custodian and place with someone with whom he only has a casual relationship.

The Court finds the Respondent/Mother and those residing with the Respondent/Mother are not appropriate given their prior histories and that her home is not a healthy, safe environment. The Respondent/Mother was found to have committed severe abuse against the minor child in 2019. The Respondent/Mother also lives with a convicted felon. Although Respondent/Mother believes she is in compliance with her probation, it is

- 4 -

unknown how her failed drug screen and her living arrangement will be pursued by her probation officer. Given the Respondent/Mother's failed drug screen, the Court finds her home to be unsafe. Finally, the Respondent/Mother has not paid child support since her release from jail. The Respondent/Mother provided gifts one time however, these were of no significance.

Based on all these factors, the Court finds that it is in the child's best interest for the parental rights of the Respondent/Mother to be terminated.

Mother appealed.

This Court in *In re Nash M.*, No. E2021-01126-COA-R3-PT, 2022 WL 7173068 (Tenn. Ct. App. Oct. 13, 2022) entered a memorandum opinion, vacating the Trial Court's judgment due to the insufficiency of the record on appeal. *Id.* at *1-2. Neither transcripts of the proceedings nor a statement of the evidence was provided to this Court, and this Court was, accordingly, unable to conduct a meaningful review of the termination of Mother's parental rights. *Id.* at *2. If a court reporter was present at trial, this Court instructed the Trial Court to have transcripts of the proceedings prepared. *Id.* at *2. If a transcript or detailed statement of the evidence was unavailable, this Court directed the Trial Court to conduct a new trial. *Id.*

On remand, the Trial Court held a hearing in July 2023.[3] Mother made an oral motion for a new trial, which the Trial Court denied. In an order entered in August 2023, the Trial Court granted Mother's "Motion for Administrative Office of the Court For Payment of Trial Transcripts" and reinstated the judgment terminating Mother's parental rights. Mother timely appealed, and transcripts were provided in the record for this Court's review.

## Discussion

Although not stated exactly as such, Mother raises one issue on appeal: whether the Trial Court erred in finding that termination of Mother's parental rights was in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

---

[3] Chancellor Clarence Pridemore presided over the trial and entered the judgment terminating Mother's parental rights. Prior to the remand of this case, Chancellor Richard B. Armstrong, Jr. had replaced Chancellor Pridemore as the Chancellor for the Trial Court.

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[4] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard

---

[4] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[5] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[6] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a

---

[5] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

[6] Tenn. Code Ann. § 36-1-113(i).

parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no

presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Although Mother does not challenge the ground found against her, the Tennessee Supreme Court has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). Therefore, we will review the ground found against Mother even though she does not dispute it.

On July 31, 2019, at the time the termination petition was filed, the relevant statutory grounds for termination read as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> * * *
>
> (4) The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

Tenn. Code Ann. § 36-1-113(g) (West July 1, 2019 to March 5, 2020). The definition of "severe child abuse" relevant to this case reads as follows:

> (27) "Severe child abuse" means:
>
> * * *
>
> (E) Knowingly or with gross negligence allowing a child under eight (8) years of age to ingest an illegal substance or a controlled substance that

results in the child testing positive on a drug screen, except as legally prescribed to the child[.]

Tenn. Code Ann. § 37-1-102(b)(27) (West July 1, 2019 to May 24, 2021).

This ground was proven by clear and convincing evidence, given the Juvenile Court's 2019 order finding that the Child was a victim of severe abuse. Although the Juvenile Court did not specify which subsection of Tenn. Code Ann. § 37-1-102(b)(27) applied, the Juvenile Court made the following facts:

> The mother testified that Arshad R[.] had the child in his care on December 4 and December 5 of 2018, that she attempted to reach Arshad R[.] on three different occasions between December 4 and December 5, that she called law enforcement on December 5 around 2:08 A.M. but was told that no one had reported a missing child.

> Keshia Mihalik testified that she and law enforcement attempted to contact the mother multiple times on December 4 and December 5, that law enforcement was unable to locate the mother, that the mother came to the Department of Children's Services office and submitted to a urine drug screen that showed positive results for methamphetamine.

> The Department of Children's Services presented Exhibit 1 at the previous court hearing into the Court's record without objection. Exhibit 1 consisted of a hair follicle drug screen given to the child, which showed a positive indication for methamphetamine.

> From all of the above, the Court finds the following by clear and convincing evidence:

> 1. The mother was positive for methamphetamine on December 5, 2018;

> 2. The child was found in a vehicle with Arshad R[.] that also had methamphetamine in the vehicle.

> 3. The child's hair follicle drug screen showed a very high level of methamphetamine.

> 4. The mother knew that placing the child in the care of Mr. R[.] could cause severe bodily injury or death.

> 5. This Court, in applying the law to the facts in this case, finds by clear and convincing evidence that the child, Nash M[.], is a victim of severe

- 10 -

abuse, as defined in TCA § 37-1-102(b)(27), based on the mother's actions in placing the child in the care of Arshad R[.], could have caused severe bodily injury or death.

Despite the Juvenile Court's failure to specify a subsection of the statute, its order clearly demonstrates that the Juvenile Court found that the Child had been exposed to methamphetamine to such a degree that the Child tested positive for a "very high level of methamphetamine." This finding satisfies subsection (E), "[k]nowingly or with gross negligence allowing a child under eight (8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed to the child." There is no claim or any indication that Mother appealed this order or that it is non-final. We accordingly affirm the Trial Court's finding of this statutory ground for termination of Mother's parental rights.

We next address whether the Trial Court erred in finding that termination of Mother's parental rights was in the Child's best interest. At the time the petition was filed, the statutory best interest factors read as follows:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or

- 11 -

psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

With regard to making a determination concerning a child's best interest, the Tennessee Supreme Court has instructed:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d [507] at 523 [(Tenn. 2016)] (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d [533] at 555 [(Tenn. 2015)] (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

Mother contests the Trial Court's findings for every best interest factor. With respect to the first factor, whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian, Mother argues that the Trial Court focused too heavily upon Mother's "lack of drug screens" and the August 2021 positive hair follicle test for methamphetamine, while failing to acknowledge "any of the efforts made and maintained by" Mother. Although Mother did secure a place to live, a car, and employment, we discern no error in the Trial Court's emphasis on Mother's positive drug screen on the second day of trial, particularly given Mother's insistence that there was no reason to submit to a drug screen, that she had not used methamphetamine since March 2020, and that she claimed Petitioners somehow bribed the testing lab to fabricate a positive test result for methamphetamine. As the Trial Court noted in its oral findings, Mother is unwilling even to acknowledge that she has a drug problem. Mother's lack of honesty and credibility as found by the Trial Court, coupled with her continued illegal drug use, certainly outweighs any positive actions that she has taken to remedy her situation. We find nothing in the record calling into question the Trial Court's credibility determinations. The evidence does not preponderate against the Trial Court's findings as to this factor.

Concerning the second factor, whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible, Mother simply asserts the following: "The trial court found that Respondent . . . failed to avail herself of any social services. . . . That finding is simply not supported by the record." The Trial Court found: "When the minor child was removed from Mother's care, the

Department of Children's Services developed a Permanency Plan giving the Respondent/Mother the opportunity to regain custody of the minor child, however, the Respondent/Mother did not avail herself of this service and instead got arrested and spent a year in jail." Mother points to no evidence in the record to contradict this finding. Although DCS was not involved in this case at the time of trial, DCS did create a permanency plan with recommendations for Mother, and Mother did get arrested on a methamphetamine charge and spent approximately ten months in jail after this plan was developed. Although Mother did work with Frontier Health, she evidently was not honest with her case worker, Ms. Gilliam, given that she tested positive for methamphetamine in the midst of trial despite telling Ms. Gilliam that she did not get "cravings." The evidence does not preponderate against the Trial Court's findings as to this factor.

Concerning the third factor, whether the parent or guardian has maintained regular visitation or other contact with the child, Mother essentially argues that the Trial Court should have credited Mother's account of the quantity and quality of those visits as opposed to Chelsea H.'s "vastly different" account. With respect to the fourth factor, whether a meaningful relationship has otherwise been established between the parent or guardian and the child, Mother argues that the Trial Court incorrectly described her relationship with the Child as "casual," given that Mother presented a scrapbook of photos of her with the Child and the fact that the Child spent nearly the first two years of his life with Mother. Regarding these factors, the Trial Court found:

> The Court finds that although the Respondent/Mother had the opportunity to exercise visitation 59 times, she only exercised visitation on 24 occasions. The Court previously informed Respondent/Mother that if she completed a hair follicle drug screen and the results were favorable, the Court would consider exp[a]nding her visitation, however, she never did so. Because of her lack of consistent visitation, the Court finds the Respondent/Mother has not developed a meaningful relationship with the minor child. While the Court cannot say there is no relationship between the Respondent/Mother and the minor child, the Court finds the relationship is not a meaningful one.

The evidence does not preponderate against these findings, particularly given that the Trial Court found, with good reason, that Mother's testimony was evasive and lacked credibility.

Mother presents a similar argument with respect to the fifth factor, the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition. In relation to this factor, the Trial Court found that the Child did not have "any emotional or psychological issues that would be affected by a change in caretakers, however, . . . it would be stressful on the minor child to move the

minor child from the current custodian and place with someone with whom he only has a casual relationship." Mother again references the scrapbook she made to demonstrate that the Child and she have more than a casual relationship. Mother's argument establishes only that she is bonded to the Child, as far as she is concerned, and that she obviously wishes to be with the Child again, but this is not evidence of the quality of her current relationship with the Child from the Child's perspective. Mother created the scrapbook while she was incarcerated, and the book contains only photos from the Child's first two years of life. At the time of trial, the Child was approximately four years old, had lived with Petitioners since May 2019, and referred to Petitioners' son as his brother. Chelsea H. testified that she did not believe the Child was bonded to Mother. Furthermore, given that Mother still had a drug abuse problem at the time of trial, placing the Child in her custody would have a negative effect on the Child's wellbeing. The Child's wellbeing certainly would suffer if he were removed from a safe home with a family he is bonded with to a home with a mother actively using methamphetamine. The evidence does not preponderate against the Trial Court's findings.

The sixth factor, whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household, weighs in favor of termination. The seventh factor, whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner, also weighs in favor of termination. The Trial Court made the following findings of fact in relation to these two factors:

> The Court finds the Respondent/Mother and those residing with the Respondent/Mother are not appropriate given their prior histories and that her home is not a healthy, safe environment. The Respondent/Mother was found to have committed severe abuse against the minor child in 2019. The Respondent/Mother also lives with a convicted felon. Although Respondent/Mother believes she is in compliance with her probation, it is unknown how her failed drug screen and her living arrangement will be pursued by her probation officer. Given the Respondent/Mother's failed drug screen, the Court finds her home to be unsafe.

Mother does not dispute the Juvenile Court's finding that the Child "is a victim of severe abuse, as defined in TCA § 37-1-102(b)(27), based on the mother's actions." The Child tested positive for methamphetamine upon being removed to DCS custody. Furthermore, Mother failed to acknowledge her current methamphetamine use at trial, despite testing positive for methamphetamine on the second day of trial. A home with a mother who uses methamphetamine is not a safe environment. The evidence, accordingly, does not preponderate against the Trial Court's findings with respect to these two factors.

The Trial Court did not weigh the eighth factor, whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child, in favor or against termination. Mother argues that the Trial Court should have weighed this factor against termination, given that she "has exhibited safe and stable behavior since her release[] from custody in March 2020." Based upon our review of the record, this simply is not true. Although the Trial Court did not weigh this factor in favor of termination, Mother's continued methamphetamine use and refusal to acknowledge her methamphetamine use or even the validity of the August 2021 drug screen, sufficiently establishes that Mother does not have the emotional wherewithal to provide safe and stable care and supervision for the Child. It is one thing for a parent to struggle to overcome her drug addiction, but it is quite another thing for a parent to refuse even to acknowledge she has a drug problem. Based upon our review of the record, this factor weighs in favor of termination.

The Trial Court weighed the ninth and final factor, whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101, in favor of termination. The Trial Court found that Mother had "not paid child support since her release from jail." The Trial Court further found that she "provided gifts one time", but "these were of no significance." Mother argues that there was no child support order in effect, that Petitioners neither asked for support nor wanted support, and that Mother's "in-kind gifts were essentially rejected." Nevertheless, a parent has a duty to support her child regardless of whether there is a child support order or not. *State, Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 523-24 (Tenn. Ct. App. 2004) ("[T]he obligation to pay support exists even in the absence of a court order to do so."). In addition, Chelsea H. testified that Petitioners simply requested that Mother communicate to them through their attorney, including communications about clothing size and gifts. Such a request falls short of preventing Mother from providing support. The evidence does not preponderate against the Trial Court's findings. We find that clear and convincing evidence established that termination of Mother's parental rights was in the Child's best interest.

## Conclusion

For the foregoing reasons, we affirm the Trial Court's judgment terminating Mother's parental rights to the Child. This cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Kelsie M., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

- 16 -